Electronically Filed
Supreme Court
SCAP-24-0000079
12-SEP-2025
07:53 AM
Dkt. 46 OP

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

_____

FREDERICK A. NITTA, M.D., INC.; FREDERICK A. NITTA,
individually; HAWAII COUNTY MEDICAL SOCIETY; CHARLENE ORCINO;
and ADRIAN "SCOTT" NORTON,
Plaintiffs-Appellees,

vs.

HAWAII MEDICAL SERVICE ASSOCIATION,
Defendant-Appellant.

_____

SCAP-24-0000079

APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CAAP-24-0000079; CASE NO. 3CCV-22-0000033)

SEPTEMBER 12, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

OPINION OF THE COURT BY McKENNA, J.

## I. Introduction

In general, this appeal concerns whether a doctor and his
medical practice, as well as Hawai'i Island patients, must be
compelled to arbitrate various claims they brought against the
Hawai'i Medical Service Association ("HMSA"). This appeal

concerns arbitrability, not the merits of the alleged unconscionability of various HMSA contracts.

This is because arbitration agreements are subject to the Federal Arbitration Act ("FAA"), which "creates a body of federal substantive law of arbitrability, enforceable in both state and federal courts[.]" Narayan v. The Ritz-Carlton Dev. Co., 140 Hawai'i 343, 350, 400 P.3d 544, 551 (2017) (cleaned up). When presented with a motion to compel arbitration, a circuit court must first determine whether an arbitration agreement exists between the parties. Koolau Radiology, Inc. v. The Queen's Med. Ctr., 73 Haw. 433, 445, 834 P.2d 1294, 1300 (1992). If an arbitration agreement exists, the circuit court must then determine whether the subject matter of the dispute is arbitrable under the agreement. Id.

Even if a dispute is arbitrable under an arbitration clause, arbitration clauses are voidable upon such grounds as exist at law or in equity for the revocation of a contract. Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 445-46 (2006). One of those grounds is unconscionability. Narayan, 140 Hawai'i at 350, 400 P.3d at 551. But unconscionability must be raised and addressed only as to the arbitration clause itself, not as to the contract as a whole. Buckeye, 546 U.S. at 445-46. In addition, "unless the challenge is to the arbitration clause itself, the issue of the contract's validity

2

[including unconscionability] is considered by the arbitrator in the first instance."  Id.

The Circuit Court of the Third Circuit[1] ("circuit court") did not engage in this analytical framework when it addressed HMSA's motion to compel arbitration and for other relief. Instead of determining whether plaintiffs' claims were arbitrable, it focused on their claims of unconscionability of the contracts as a whole.  The circuit court erroneously addressed the merits, concluding that HMSA's contracts were unconscionable and caused harm to the plaintiffs.

These rulings were beyond the scope of a motion to compel arbitration.  Hence, we vacate in part the circuit court's order as to certain of plaintiffs' claims that were arbitrable.  But we also determine that one plaintiff's claims are not arbitrable under an arbitration clause, one plaintiff's claims are not required to be arbitrated, and another plaintiff's claims are not subject to a grievance and appeals clause.

We therefore remand this case to the circuit court for further proceedings consistent with this opinion.

---

[1]    The Honorable Robert D.S. Kim presided.

## II.  Background

### A.  Complaint and answer

#### 1.  Complaint

##### a.  Parties

The plaintiffs are Frederick A. Nitta, M.D., Inc. ("FNI"), Dr. Frederick A. Nitta ("Dr. Nitta"), the Hawai'i County Medical Society ("HCMS"), Charlene Orcino ("Orcino"), and Adrian "Scott" Norton ("Norton") (collectively, "plaintiffs").  Dr. Nitta has owned and operated FNI, a Hawai'i Island corporation, since 1993.  HCMS is a corporation made up of health care professionals, including Dr. Nitta and FNI.  Orcino and Norton are residents of Hawai'i County.

The defendant is HMSA.

##### b.  Complaint's allegations

The operative complaint is plaintiffs' January 9, 2023 third amended verified complaint ("complaint").  In addressing arbitrability, we must examine the claims raised.  In summary, the complaint alleges as follows:

###### i.  FNI's claims

FNI and its patients signed "Patient Information" and "Payment Policy" forms, which created contractual relationships between them.  The payment policy made patients responsible for paying for FNI's services in full when (1) patients were uninsured, (2) or, if patients were insured, to the extent

4

services received were not covered by insurance. HMSA unlawfully interfered with these contractual agreements by ignoring Dr. Nitta's diagnoses and treatment recommendations and by unilaterally switching his patients over to other primary care physicians.

### ii.  Claims of Dr. Nitta as a patient

As a patient insured by HMSA, Dr. Nitta experienced a medical emergency in 2021 and was taken to Queen's Hospital on O'ahu. HMSA refused to make any payments to the physicians treating him or to Queens.

### iii. Norton's claims

Norton was a patient of Dr. R. Lee-Ching. After examining Norton, Dr. Lee-Ching referred him for a diagnostic MRI. HMSA denied the recommendation and required Norton to instead undergo physical therapy. Norton's health then deteriorated, and HMSA allowed Norton to undergo a diagnostic MRI. The MRI revealed prostate cancer that had spread to Norton's back and spine. Norton was flown to Queen's Medical Center on O'ahu for emergency surgery. Once a strong, healthy, active man, Norton became wheelchair-bound with limited walking ability.

### iv.  Orcino's claims

Orcino was a patient who entered into a contractual relationship with FNI in 1999. Years later, after examining a pregnant Orcino, Dr. Nitta immediately prescribed Nifedipine to

prevent premature labor.  But when Orcino went to fill the prescription at two separate pharmacies, she was told HMSA would not honor it.  Orcino then spent some time trying to raise money for Nifedipine on her own.  During that delay, she went into premature labor and had to be Medivaced to Kapiolani Hospital for Women and Children on Oʻahu, where she delivered a baby at only 25 weeks gestation.  The child survived, but now requires significant and regular medical attention based on his developmental challenges resulting from his premature birth.

### c.  Complaint's counts and ad damnum clause

The complaint alleged the following counts:

> Count I:  tortious interference with a contractual right – HMSA
>
> Count II:  tortious interference with a contractual right – [Dr. Nitta and FNI]
>
> Count III:  tortious interference with a contractual right – Charlene Orcino
>
> Count IV:  tortious interference with a contractual right – Norton
>
> Count V: unfair method of competition – HMSA
>
> Count VI: RICO – Defendants HMSA and HMSA-Individuals
>
> Count VII- Declaratory relief (HCMS and FNI)
>
> Count VIII – Negligent infliction of emotional distress – Defendant HMSA
>
> Count IX – Intentional infliction of emotional distress – Defendant HMSA and Defendant HMSA-Individuals

In Count I (tortious interference with a contractual right), plaintiffs FNI and HCMS alleged that HMSA denied tests and courses of treatment for thirty of FNI's patients,

6

identified by their initials.  This led to patients changing doctors and substituting or foregoing treatment, which worsened patients' conditions.  It also meant FNI was not paid for work done for these patients.

In Count II (tortious interference with a contractual right), FNI and Dr. Nitta alleged that HMSA unilaterally switched six of his patients over to other primary care physicians without notifying these patients.

In Count III (tortious interference with a contractual right), Orcino alleged that HMSA's refusal to cover her prescription for Nifedipine interfered with the doctor-patient relationship, worsened her condition, and resulted in the premature birth of her child, who is now severely disabled.

In Count IV (tortious interference with a contractual right), Norton alleged that HMSA's delay in approving an MRI interfered with the doctor-patient relationship and delayed his ultimate cancer diagnosis.  As a result, the cancer spread, Norton had to undergo emergency surgery, and Norton became wheelchair-bound.

In Count V (unfair method of competition), plaintiffs alleged that HMSA engaged in unfair methods of competition by delaying or denying claims for payment and unilaterally switching patients over to other primary care physicians.  These

acts imposed a financial hardship on FNI and threatened the quality of care provided to patients.

In Count VI (RICO), plaintiffs alleged that HMSA engaged in theft of services by denying medical claims and diverting patients from FNI to other primary care physicians. They also alleged HMSA engaged in theft by failing to make required disposition of funds when it obtained premiums from patients yet failed to cover their medical services.

In Count VII (declaratory relief), plaintiffs HCMS and FNI sought a declaration that FNI's "Patient Information" and "Payment Policy" documents were legally enforceable contracts between physician and patient and that HMSA cannot interfere with that contractual relationship.

As to Count VIII (NIED), Dr. Nitta and/or FNI, Orcino, and Norton alleged that HMSA's misconduct caused them to suffer emotional distress.

As to Count IX (IIED), Dr. Nitta and/or FNI, Orcino, and Norton alleged that HMSA's action or inaction caused them extreme emotional distress.

Plaintiffs sought general damages, special damages, compensatory damages, punitive damages, and HRS § 480-13(a)(1) treble damages to be awarded against HMSA. They also asked the court to refer the matter to the Hawai'i Attorney General for (1) forfeiture of HMSA's corporate charters; (2) cancellation of

registration and licenses; and (3) dissolution of HMSA's non-profit and/or mutual benefit society.  They also requested a declaration that the "Payment Information" and "Payment Policy" documents were legally enforceable contracts with which HMSA cannot interfere.  Plaintiffs further requested costs and attorney's fees, pre- and post-judgment interest, and other relief as the court may deem just and proper.

### 2.    Answer

HMSA filed its answer and, relevant here, reserved its right to seek to compel arbitration as to all or some of the claims in plaintiffs' complaint.

### B.    HMSA's motion, plaintiffs' memorandum in opposition, HMSA's reply, and the initial hearing on the motion

### 1.  HMSA's motion

HMSA filed a motion (1) to compel arbitration of FNI, Dr. Nitta, and Norton's claims; (2) for summary judgment as to Orcino's claims on the grounds her agreement with HMSA required her to appeal denial of benefits to the State of Hawai'i's Department of Human Services; and (3) to stay HCMS's claim pending arbitration.

HMSA generally contended that the complaint challenged its denial of benefits to plan members.

### a.  As to FNI's claims

HMSA attached the following agreements to which FNI was a party:  (1) the "Participating Physician Agreement"; (2) the "Provider Agreement for Medicare Plans" ("Medicare Agreement"); and (3) the "QUEST Participating Physician Agreement" ("QUEST Agreement") (collectively, the "provider agreements").

The existence of arbitration clauses in these three provider agreements is not disputed on appeal.[2]  HMSA argued that

---

[2]    Those arbitration clauses are as follows:

Section 8.2 in the Participating Physician Agreement is titled "External Appeals," and it states:

> Arbitration Upon Exhaustion of Internal Appeals.  HMSA and Participating Physician agree that any and all claims, disputes, or causes of action arising out of this Agreement or its performance, breach or termination or in any way related to this Agreement, including but not limited to any and all claims, disputes, or causes of action based upon contract, tort, statutory law, or actions in equity, shall be resolved by binding arbitration as set forth in this Agreement unless arbitration is waived pursuant to Section 4.8 of this Agreement.
>
> If Participating Physician disagrees with HMSA's decision following exhaustion of internal appeals described in Section 8.1 above, Participating Physician may submit a written request for arbitration to HMSA's Legal Department in Honolulu, Hawaii, within sixty (60) calendar days following the date of HMSA's decision.
>
> Arbitration of disputes between HMSA and Participating Physician shall be conducted by an independent arbitration service mutually selected by HMSA and Participating Physician.  Arbitration shall be conducted in Honolulu, Hawaii, except that if the physician's office is on a Neighbor Island the physician may participate in the arbitration by telephone.  If HMSA and Participating Physician are unable to agree upon an arbitration service within thirty (30) calendar days of HMSA's receipt of Participating Physician's request for arbitration, Dispute Prevention and Resolution, Inc. ("DPR"), or, if DPR is not available, another arbitration service selected by HMSA, will conduct the arbitration.  If the two parties (HMSA and

Participating Physician) are unable to agree upon an arbitrator within thirty (30) calendar days following the submission of the claim to the arbitration service, then the two parties shall select an arbitrator in accordance with the arbitration service's arbitrator selection procedures.  The arbitration will be conducted pursuant to the Hawaii Uniform Arbitration Act, HRS Chapter 658A, and the arbitration service's arbitration rules (or such other arbitration rules as the parties may mutually agree); to the extent not inconsistent with the arbitration provisions in this Agreement.  The arbitrator may hear and determine motions for summary disposition pursuant to HRS § 658A-15(b).  The arbitrator shall also hear and determine any challenges to the arbitration agreement and any disputes regarding whether a controversy is subject to an agreement to arbitrate.  In order to make the arbitration hearing fair, expeditious and cost-effective, discovery by both parties shall be limited to requests for production of documents material to the claims or defenses in the arbitration.  Limited depositions for use as evidence at the arbitration hearing may occur as authorized by HRS § 658A-17(b).  Each party (HMSA and Participating Physician) will pay its own attorney and witness fees, provided that the arbitrator shall award attorney fees and costs in an amount authorized by law to a prevailing party related to any claim or contention of a nonprevailing party, that the arbitrator determines was frivolous or wholly without merit.  Fees and costs of the arbitrator and the arbitration service may be awarded by the arbitrator as the arbitrator determines is appropriate except that HMSA shall pay the filing and arbitrator's fees if the prevailing party in the arbitration is a Participating Physician practicing as an individual in a group of less than six Participating Physicians.  If no award is made, fees and costs of the arbitrator and the arbitration service shall be shared equally by both parties.  The decision of the arbitrator shall be final and binding on HMSA and the Participating Physician and judgment shall be entered thereon upon timely motion by either party in a court of competent jurisdiction.  No other action may be brought in any court in connection with this decision, except as provided under the Hawaii Uniform Arbitration Act.  There shall be no consolidation of parties in the arbitration proceeding.  The arbitrator may award any remedy that can be granted by a court in like circumstances, provided that no award of punitive damages or exemplary damages shall be made.  The parties shall take appropriate precautions to protect the confidentiality of any personal health information related to the arbitration proceeding.

Section 8.2(a) in the Medicare Agreement is titled "Arbitration Upon Exhaustion of Internal Appeal," and it states:

HMSA and Provider agree that any and all claims, disputes, or causes of action arising out of this Agreement or its performance, breach or termination or in any way related to

this Agreement, including but not limited to any and all claims, disputes, or causes of action based upon contract, tort, statutory law, or actions in equity, shall be resolved by binding arbitration as set forth in this Agreement, except that in lieu of arbitration, and only for disputes involving an MA or MA-PD Plan Member, Provider may elect review described in Section 8.2(b) below for certain billing disputes and review described in Section 8.2(c) below for certain medical necessity disputes.

If Provider disagrees with HMSA's decision following exhaustion of internal appeals described in Section 8.1 above, Provider shall submit a written request for arbitration to HMSA's Legal Services in Honolulu, Hawaii, within sixty (60) calendar days following the date of HMSA's decision.

Arbitration of disputes between HMSA and Provider shall be conducted by an independent arbitration service mutually selected by HMSA and Provider. Arbitration shall be conducted in Honolulu, Hawaii, except that if the physician's office is on a Neighbor Island the physician may participate in the arbitration by telephone. If HMSA and Provider are unable to agree upon an arbitration service within thirty (30) calendar days of HMSA's receipt of Provider's request for arbitration, Dispute Prevention and Resolution, Inc. ("DPR") will conduct the arbitration. If the two parties (HMSA and Provider) are unable to agree upon an arbitrator within thirty (30) calendar days following the submission of the claim to the arbitration service, then the two Parties shall select an arbitrator in accordance with the arbitration service's arbitrator selection procedures. The arbitration will be conducted pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and the arbitration service's arbitration rules applicable to the Federal Arbitration Act, or pursuant to such other arbitration rules as the Parties may mutually agree. The arbitrator may hear and determine motions for summary judgment under the same standards applicable under Rule 56 of the Federal Rules of Civil Procedure. Each party (HMSA and Provider) will pay its own attorney and witness fees, provided that the arbitrator may award attorney fees and costs to a prevailing party related to any claim or contention of a nonprevailing party, that the arbitrator determines was frivolous or wholly without merit. Fees and costs of the arbitrator and the arbitration service may be awarded by the arbitrator as the arbitrator determines is appropriate except that HMSA shall pay the filing and arbitrator's fees if the prevailing party in the arbitration is a Provider practicing as an individual in a group of less than six (6) Providers. If no award is made, fees and costs of the arbitrator and the arbitration service shall be shared equally by both Parties. The decision of the arbitrator shall be final and binding on HMSA and the Provider and judgment shall be entered thereon upon timely motion by either Party in a

12

each of these provider agreements required arbitration of "any

and all claims, disputes, or causes of action arising out of

---

> court of competent jurisdiction.  No other action may be
> brought in any court in connection with this decision,
> except as provided under the Federal Arbitration Act.
> There shall be no consolidation of parties in the
> arbitration proceeding.  The Parties shall take appropriate
> precautions to protect the confidentiality of any personal
> health information related to the arbitration proceeding.

Section 8.3 in the QUEST Agreement is titled "Arbitration Upon Exhaustion of Administrative Appeal," and it states:

> HMSA and Participating Physician agree that, except for
> disputes related to the HMSA QUEST Fee Schedule and
> termination of this Agreement by HMSA based upon a
> recommendation of HMSA's Credentialing Committee, any and
> all claims, disputes, or causes of action arising out of
> this Agreement or its performance, or in any way related to
> this Agreement or its performance, including but not
> limited to any and all claims, disputes, or causes of
> action based upon contract, tort, statutory law, or actions
> in equity, shall be resolved by binding arbitration as set
> forth in this Agreement.
>
> Within 30 calendar days following Participating Physician's
> exhaustion of administrative remedies described above,
> Participating Physician shall submit a written request for
> arbitration to Legal Services at HMSA in Honolulu, Hawaii.
> The arbitration shall be conducted in accord with the
> Commercial Arbitration Rules of the American Arbitration
> Association or its successor.
>
> HMSA and Participating Physician shall promptly appoint a
> single arbitrator.  Should both parties fail to agree on a
> single arbitrator within 30 calendar days of Participating
> Physician's request for arbitration, either party may apply
> to the First Circuit Court, State of Hawaii, for
> appointment of an arbitrator.  Both parties shall share the
> arbitrator's fee equally.  All other costs of the
> arbitration will be paid as ordered by the arbitrator,
> except that each party will pay its own attorney and
> witness fees.  The decision of the arbitrator shall be
> final and binding on both parties.
>
> Dispute resolution related to termination of this Agreement
> by HMSA based upon a recommendation of HMSA's Credentialing
> Committee shall be in accord with HMSA's credentialing
> policies and procedures.

this Agreement or its performance, breach or termination or in any way related to this Agreement, including but not limited to any and all claims, disputes, or causes of action based upon contract, tort, statutory, law, or actions in equity. . . ."

HMSA cited County of Hawai'i v. UNIDEV, LLC, 129 Hawai'i 378, 395-96, 301 P.3d 588, 605-06 (2013), for the proposition that the phrases "arising under" and "arising out of or in relation to" in the arbitration provisions are to be broadly interpreted to encompass FNI's claims.

### b. As to claims of Norton and Dr. Nitta as a patient

HMSA also attached to its motion the EUTF 75/25 PPO Member Handbook (relevant to Norton's claims); and the "Small Business CompMED – A Plan" (relevant to Dr. Nitta's claims as a patient). HMSA argued that these member handbooks set forth the procedure for members to appeal the denial of benefits.

The member handbooks for both Norton and Dr. Nitta (as a patient) each contain a chapter titled "Dispute Resolution." The chapters are nearly identical. Both require members who "wish to dispute a decision made by HMSA related to coverage, reimbursement, this Agreement, or any other decision or action by HMSA" to first request an appeal within a year of HMSA's action. HMSA states it will issue a written decision within 30 or 60 days from the receipt of the appeal. If a member disagrees with HMSA's decision with respect to "an issue of

medical necessity, appropriateness, health care setting, level of care, or effectiveness; or a determination by HMSA that the service or treatment is experimental or investigational," the member "must" request review by an Independent Review Organization selected by the Insurance Commissioner.

"For all other issues," the member may "[r]equest arbitration before a mutually selected arbitrator" or "[f]ile a lawsuit against HMSA under 29 U.S.C. 1132(a) unless [the member's] plan is" a "church plan" under 29 U.S.C. 2002(33) or a "government plan" under 29 U.S.C. 1002 (32), in which case the member "must select arbitration."

HMSA argued that to the extent the complaint alleged claims concerning Dr. Nitta's treatment as a patient, those claims also related to "coverage, reimbursement, the Agreement, or any other decision or action by HMSA" and were required to be arbitrated. HMSA likewise argued that Norton's challenge to HMSA's delayed coverage of his diagnostic MRI were also required to be arbitrated.

### c. As to Orcino's claims

HMSA also attached to its motion the Quest Integration Member Handbook relevant to Orcino's claims. Instead of an arbitration clause, Orcino's member handbook contains a section titled "Grievances and Appeals." The process laid out is

somewhat confusing and unclear,[3] but it does not refer to arbitration.

HMSA argued that Orcino's options, if she did not agree with HMSA's denial of coverage, were primarily dictated by the Med-QUEST Division of DHS, and that the grievance and appeal procedure set forth in the handbook is in line with DHS's administrative rules, 17-1703.1-3 of the Hawai'i Administrative Rules ("HAR") which provides: "Every individual **shall** be provided an opportunity for a hearing where an adverse action affects the individual's eligibility, **benefits**, services or claims." (Bold emphases in original, underlining added).

---

[3] It first says that members <u>may</u> file a grievance if they're not happy with (1) the quality of care or service provided; (2) the way HMSA staff treated them; (3) their doctor and how they were treated by the doctor or the staff; or (4) the way their rights weren't respected.

It then goes on to say that if a member is not happy with HMSA's grievance decision, the member <u>may</u> request a grievance review with DHS's Med-QUEST Division. It says that the grievance review decision made by Med-QUEST is final.

But it then says that a member <u>may</u> file an appeal with HMSA if (1) the service a member asked for was denied or restricted; (2) the authorization for a service was terminated, suspended, or reduced; (3) a member isn't happy with health care services because they weren't timely, there were unreasonable delays, or the grievance or appeal decision wasn't carried out in a timely way; or 4) the member doesn't agree with a payment that was denied or reduced. It also says members can request an expedited appeal if the standard appeal deadline (1) could seriously jeopardize a member's life or health; (2) could seriously jeopardize a member's ability to attain, maintain, or regain maximum function; or (3) could subject a member to severe pain that can't be managed without the care or treatment that's being requested.

The handbook also say that members <u>may</u> then ask for state administrative hearings or expedited state administrative hearings if they are not happy with HMSA's appeal decision.

HMSA requested summary judgment in its favor with respect to Orcino's claims based on an alleged lack of subject matter jurisdiction.

### d.    Summary

Thus, in summary, HMSA asked the circuit court to issue an order (1) compelling arbitration of the claims brought by FNI, Dr. Nitta, and Norton; (2) granting summary judgment as to Orcino's claims for lack of subject matter jurisdiction; and (3) staying HCMS's claims pending arbitration.

### 2.  Plaintiffs' memorandum in opposition

In their memorandum in opposition, instead of addressing the arbitration clauses in the provider agreements, plaintiffs argued there was no written agreement to arbitrate because the "Patient Information" and "Payment Policy" agreements were between the physicians and their patients, not with HMSA.  They then argued that those contracts do not evidence any intent to arbitrate.  Plaintiffs also argued that the provider agreements and member handbooks were not incorporated by reference into the "Patient Information" or "Payment Policy" documents.

Plaintiffs then posited a fraud argument not alleged in the complaint--that, assuming there are enforceable arbitration agreements, HMSA engaged in fraud to induce the plaintiffs to sign the agreements.  Plaintiffs argued that HMSA fraudulently induced them to sign the provider agreements by falsely

informing them that contract terms could be negotiated. Plaintiffs asserted they later learned that no suggestions they made were incorporated by HMSA in the provider agreements; therefore, they argued, the provider agreements were contracts of adhesion.

Plaintiffs lastly argued that HMSA failed to show that Orcino and Norton received and agreed to any of the terms and conditions of their member handbooks. They asserted that the declaration of HMSA's Senior Manager of Medical Operations, attesting that members receive member handbooks, was insufficient to establish receipt because Orcino and Norton declared they had not received their respective member handbooks.

Plaintiffs therefore requested that the circuit court deny HMSA's motion in its entirety.

### 3.  HMSA's reply

In its reply, HMSA counter-argued that the issue is not whether plaintiffs were required to arbitrate disputes among themselves, but whether they were required to arbitrate their disputes with HMSA.

HMSA also argued that the plaintiffs' "fraud in the inducement" argument should be rejected because (1) fraud had not been pled with particularity anywhere in the complaint; and (2) the allegedly fraudulent statements (that FNI could

18

negotiate the arbitration provision in his physician agreements with HMSA) post-dated the filing of the complaint and therefore could not have been relied upon.

### 4. Initial hearing on the motion

At the initial hearing on the motion, the circuit court requested supplemental briefing on "whether or not the . . . agreements between the doctor and HMSA as well as the patients constitute contracts of adhesion, whether or not there is a . . . weaker party and stronger party as to not actually have an agreement that . . . should be enforced."

## C. Supplemental briefing

### 1. HMSA's supplemental brief

In its supplemental brief, HMSA quoted <u>Leong v. Kaiser Foundation Hospitals</u>, 71 Haw. 240, 248, 788 P.2d 164, 169 (1990), regarding the legal standards for contracts of adhesion: (1) the contract is the result of coercive bargaining between parties of unequal bargaining strength; and (2) the contract unfairly limits the obligations and liabilities of, or otherwise unfairly advantages, the stronger party.

As background information, HMSA pointed out that it provides health insurance to approximately 780,000 members statewide. It also enters into provider agreements with thousands of healthcare providers statewide. For this reason, HMSA argued that provider agreements and members handbooks must

19

have a significant degree of standardization.  HMSA argued that allowing agreements to be negotiated on a case-by-case basis would cause the cost of healthcare in Hawai'i to increase exponentially and that the administrative overhead to implement, apply, and maintain those differing agreements would be unmanageable.

HMSA contended that, even so, it allows providers and the Hawai'i Medical Association ("HMA") to submit feedback on draft provider agreements each year and incorporates their ideas where feasible.  Similarly, HMSA stated it allows organizations like the Hawaii Employer-Union Health Benefits Trust Fund ("EUTF") to review, negotiate, and revise draft member handbooks on their members' behalf.

Therefore, HMSA argued, the provider agreements, as well as Norton's and Orcino's[4] member handbooks, lack the hallmarks of unenforceable contracts of adhesion.

With respect to FNI's provider agreements specifically, HMSA pointed out that FNI provided no input into the 2020 provider agreements, which are the agreements at issue.  HMSA also argued that FNI provided late and unreasonable input on the 2023 Participating Physician Agreement, which is not at issue,

---

[4]     HMSA's supplemental brief does not discuss Dr. Nitta's Small Business CompMED – A Plan member handbook, which would cover Dr. Nitta's claims as a patient.

as plaintiffs filed their complaint in January 2023.  As to communications between Dr. Nitta and an HMSA representative, HMSA argued that while the representative stated that the arbitration provision in the provider agreement was "standard" and not negotiable, she did tell Dr. Nitta that if he had any concerns, she would relay them to HMSA's legal department.  HMSA said Dr. Nitta did not opt to relay any concerns.

With respect to FNI's Medicare and QUEST Agreements, HMSA argued they cannot be adhesive because their terms are dictated by the State and federal governments.  HMSA also argued that Orcino's QUEST plan was the result of HMSA meeting the exacting requirements of the State's QUEST request for proposals and was not a contract of adhesion.

Regarding the dispute resolution provisions in Norton's and Orcino's member handbooks, HMSA also argued that, pursuant to Leong, a dispute resolution provision in a member handbook is not adhesive when members' interests were negotiated by their unions (in Norton's case) or by DHS (in Orcino's case).  See Leong, 71 Haw. at 247-48, 788 P.2d at 168-69.  With respect to the arbitration provision in Norton's member handbook,[5] HMSA argued that EUTF negotiated the member handbook (and its

---

[5]     Norton's wife, Charlotte Huson, was a public school teacher and member of EUTF through the Hawaii State Teachers Association.  Norton was covered by HMSA through his wife.

arbitration provision) with HMSA; therefore, HSMA argued that the arbitration provision was not a contract of adhesion.

HMSA then turned to address unconscionability. HMSA did so because contracts of adhesion are enforceable unless they are also procedurally and substantively unconscionable. Courbat v. Dahana Ranch, Inc., 111 Hawai'i 254, 266, 141 P.3d 427, 439 (2006). HMSA argued that even if the provider agreements were adhesive, they were not unconscionable.

With respect to procedural unconscionability, HMSA argued that its provider agreements are short and that dispute resolution provisions appear in their own articles, listed in the table of contents. With respect to substantive unconscionability, HMSA argued that the arbitration provisions were not substantively unconscionable because they "apply with equal force to HMSA and FNI."

HMSA also argued that the dispute resolution provisions in Orcino's member handbook were not unconscionable. First, HMSA argued Orcino's dispute resolution provisions were not procedurally unconscionable because she could choose among five QUEST health plans and could leave the HMSA QUEST health plan if she was not satisfied. Also, prospective members are provided with informational packets and enrolled members are informed of HMSA's QUEST member handbook provisions via an annual notice reminding them of how to access the online handbook or request a

hard copy.  Second, HMSA argued that the dispute resolution provisions in Orcino's member handbook were not substantively unconscionable because they were dictated by state and federal statutes governing Medicaid.

With respect to the arbitration provision in Norton's member handbook, HMSA argued that Norton's arbitration provision was not unconscionable.  First, it was not procedurally unconscionable because members and potential members are provided with information about the HMSA plan.  Second, it was not substantively unconscionable because HMSA's dispute resolution procedures are required by the EUTF's administrative rules, and in addition to those procedures, HMSA offered arbitration as an expeditious and cost-effective alternative to litigation.  Moreover, HMSA maintained, the arbitration provision bears equally on HMSA and members like Norton.

### 2.  Plaintiffs' supplemental brief

Plaintiffs also cited Leong for the legal standard for contracts of adhesion.  Plaintiffs acknowledged that contracts of adhesion may be enforceable, provided they are not unconscionable.  But plaintiffs argued that the three provider agreements[6] entered into by FNI were unconscionable.

---

[6]     Plaintiffs' supplemental brief does not discuss the member handbooks for Norton, Orcino, and Dr. Nitta as a patient.

First, according to plaintiffs, these provider agreements were procedurally unconscionable because their terms were non-negotiable; according to plaintiffs, HMSA controlled all aspects of the agreements plaintiffs and physicians were forced to sign. Plaintiffs also submitted declarations of fourteen additional doctors who averred they were not able to negotiate the terms of their provider agreements with HMSA. Plaintiffs attributed poor patient outcomes, loss of patients, patient deaths, blackballing and shuttering of medical practices, and Hawai'i's doctor shortage to HMSA's oppressive control over medical services payments.

Second, plaintiffs argued that the three provider agreements were substantively unconscionable because HMSA decides which medical services will be covered and forbids physicians from collecting payment from patients for non-covered services. They also argued the provider agreements violate public policy. Specifically, plaintiffs argued they violate HRS § 453-1 (2013 & Supp. 2021), which is titled "Practice of medicine defined," and which states, in relevant part:

> For the purposes of this chapter, the practice of medicine by a physician or an osteopathic physician includes the use of drugs and medicines; surgery; manual medicine; water; electricity; hypnotism; telehealth; the interpretation of tests, including primary diagnosis of pathology specimens, medical imaging, or any physical; osteopathic medicine; any means, method, or agent, either tangible or intangible, to diagnose, treat, prescribe for, palliate, or correct disease, or prevent any human disease, condition, ailment, pain, injury, deformity, illness, infirmity, defect, physical or mental condition in the human subject.

24

Thus, plaintiffs asserted that HMSA interferes with the power of physicians to determine and prescribe medical care to their patients.

Plaintiffs concluded that the provider agreements are contracts of adhesion that are unconscionable and unenforceable.

Notably, plaintiffs did not discuss the arbitration provisions, except to allege in passing that (1) the arbitration provision in the Participating Physician Agreement allows HMSA to "unilaterally select[] the arbitrator"; (2) the arbitration provision in the Medicare Agreement allows HMSA to "dictate[] the location where any arbitration will be held"; and (3) the QUEST Agreement allows HMSA to "reserve[] the right to dictate the terms, process and location of arbitration."

### 3. HMSA's reply

In its reply, HMSA argued that plaintiffs' assertions were inaccurate. First, the Participating Physician Agreement states that the parties will mutually select the arbitrator. Second, the Medicare Agreement does state that arbitration will be held in Honolulu, but that neighbor island physicians may participate by phone. Third, the QUEST Agreement states that the arbitration shall be conducted in accord with the Commercial Arbitration Rules of the American Arbitration Association, that

25

the parties will appoint the arbitrator, and does not mention a location for arbitration.

**D.    Second hearing on the motion and circuit court's ruling**

After this supplemental briefing, the circuit court held a second hearing on the motion on December 18, 2023.

By this time, Norton had passed away.

On February 2, 2024, the circuit court filed its findings of fact, conclusions of law, and order denying HMSA's motion. The circuit court adopted the plaintiffs' proposed document in toto.  The circuit court did not discuss or analyze whether the arbitration provisions in the provider agreements cover the subject matter of the plaintiffs' claims or whether the arbitration provisions themselves are unconscionable.

Rather, the circuit court ruled on the merits of the plaintiffs' claims about the unfairness of the provider agreements.  The circuit court determined that the three provider agreements were contracts of adhesion, finding that:

> [FOF] 11. Defendant HMSA's agreements expressly invalidated the Plaintiffs' "Payment Policy" with their patients.
>
> [FOF] 12. Defendant HMSA reserved the exclusive right to terminate the agreements.
>
> [FOF] 13. In terms of the Defendant HMSA's agreements, Plaintiffs were not permitted to negotiate and/or change any of the language or terms within the agreements.
>
> [FOF] 14. Defendant HMSA's authorized representative informed Plaintiff [Dr. Nitta] that HMSA refused to negotiate any of the terms and conditions of its agreements.

26

[FOF] 15. Defendant HMSA had a policy and practice of refusing to negotiate any of the language, terms and conditions of its agreements with physicians and providers across the State of Hawaii.

The circuit court then also concluded that the three provider agreements were unconscionable. COL 6 concluded that the three agreements were procedurally unconscionable because "the terms and conditions of the HMSA Agreements were oppressive and a disappointment to the Plaintiff in terms of negotiating any of the terms." By "terms," the circuit court meant HMSA's (1) "exclusive authority to determine what the physician will be paid or if the physician will be paid at all"; (2) invalidat[ion of] "the Plaintiffs' 'Payment Policy' with its patients"; and (3) "exclusive right to terminate the agreements."

The circuit court's COL 7 concluded that the agreements were substantively unconscionable because they contravened the public policy reflected in HRS § 453-1 titled "Practice of medicine defined." Specifically, the circuit court concluded that HMSA "wrongfully infringe[s] on the practice of medicine between the physician and patient" by exercising "the exclusive right to determine what is a 'Covered Service' eligible for reimbursement" and by "prohibiting the physician from seeking any payment for a procedure that HMSA finds is not a 'Covered Service.'"

27

The circuit court then concluded that "Defendant's interference with the Plaintiffs' contractual relationships had severe effects."  With respect to Orcino, the "severe effects" of HMSA's refusal to cover her Nifedipine prescription included being "medivaced to Honolulu for emergency delivery of an extremely premature baby at only twenty-five (25) weeks, gestation" and the child's current "substantial[] disab[ility]."  With respect to Norton, the "result of HMSA['s] refusal to allow [him] to take advantage of Dr. Lee-Ching's initial diagnosis . . . [was] limited walking ability, when [Norton] used to be a strong, healthy and active man."

On these bases, the circuit court denied HMSA's motion to compel arbitration, for summary judgment as to Orcino's claims, and to stay HCMS's claims pending arbitration. HMSA filed its notice of appeal on February 7, 2024.  On October 23, 2024, we granted plaintiffs' motion to transfer the appeal to this court from the Intermediate Court of Appeals ("ICA"). After completion of amici briefing, oral argument took place on June 10, 2025.

### III.  Standards of Review

#### A.  Motion to compel arbitration

A motion to compel arbitration is reviewed de novo and based on the same standard that applies to a summary judgment

ruling.  See Koolau Radiology, 73 Hawaiʻi at 440, 834 P.2d at 1298 ("We review [motions to compel arbitration] de novo, using the same standard employed by the trial court and based upon the same evidentiary materials as were before it in determination of the motion.") (cleaned up).

## B.  Contract interpretation

"As a general rule, the construction and legal effect to be given a contract is a question of law freely reviewable by an appellate court."  Casumpang v. ILWU Local 142, 108 Hawaiʻi 411, 420, 121 P.3d 391, 400 (2005) (cleaned up).

## IV.  Discussion

## A.  The parties' briefing

### 1.  HMSA's opening brief

In its opening brief, HMSA argues that the circuit court's order was a significant overreach; rather than determining the narrow issue of arbitrability, the circuit court instead ruled that the agreements themselves were unenforceable.

HMSA asserts that the circuit court erred by analyzing the unconscionability of the HMSA contracts in totality when the law required it to analyze only the arbitration provisions.  Had it properly analyzed the arbitration provisions, HMSA contends, the circuit court would have concluded that the plaintiffs' claims "arose under" the arbitration provisions, pursuant to UNIDEV,

129 Hawai'i at 395-96, 301 P.3d at 605-06, and were therefore arbitrable.

HMSA also posits that the circuit court erred by concluding that Norton's member handbook, and the Participating Provider Agreement, the Medicare Agreement, and the QUEST Agreement were unconscionable and unenforceable. HMSA also maintains that the circuit court erred by making factual and legal findings on the merits of plaintiffs' claims, when those were not at issue on a motion to compel arbitration.

### 2. Plaintiffs' answering brief

Plaintiffs' answering brief focuses on the alleged unconscionability of the provider agreements and member handbooks as a whole, not the arbitration provisions themselves. Regarding the arbitration provisions, they reiterate arguments made in the circuit court. Plaintiffs also argue, for the first time on appeal, that Norton's and Orcino's dispute resolution provisions were procedurally unconscionable because they were buried in 84-page member handbooks. Plaintiffs conclude by requesting that this court affirm the circuit court's order.

### 3. HMSA's reply brief

In its reply brief, HMSA argues that plaintiffs cannot raise a new argument about the "buried" arbitration provisions for the first time on appeal.

**B. Amici briefs**

Three groups filed amici briefs: (1) Hilo Community Surgery Center, Kauai Community Health Alliance, Dr. Stuart Lerner, Dr. Michelle Mitchell, and Dr. Casey Yamashita (collectively, "HCSC"); (2) Hawaiʻi Medical Association and the American Medical Association ("HMA/AMA"); and (3) Maui Nui Medical Society ("MNMS").

HCSC's amicus brief generally asserts that HMSA has caused harm to medical providers in Hawaiʻi through its payment policies, but there is no specific argument about the arbitrability of the plaintiffs' claims.

HMA/AMA's amicus brief also generally argues that "[t]he inadequate systems in place that pay and reimburse physicians, increased administrative burdens, unfair physician provider agreements, and the business practices by insurers like [HMSA] have placed immense pressure on independent physicians." HMA acknowledges that, in 2021, it "did review changes to HMSA's [Participating Physician Agreement] contracts," but that the focus at that time was on "termination with and without cause with a 60-day notice," not on the arbitration provisions. HMA, however, would not consider its review of the HMSA Participating Physician Agreement draft to "constitute actual negotiations."

Lastly, MNMS's amicus brief raises as substantively unconscionable the following provisions within the provider

31

agreements' arbitration provisions:  (1) exclusion of punitive damages,[7] (2) selection of Honolulu as the arbitration location because telephonic participation "does not equal full participation," (3) limitation on discovery to documents "material to claims and defenses in the arbitration" and "preservation depositions," and (4) prohibition on consolidation of parties in an arbitration proceeding.

HMSA asks this court to disregard HCSC's and HMA/AMA's amicus briefing as irrelevant to the arbitrability issue, and to disregard MNMS's amicus brief as making arguments about the arbitration provision that the plaintiffs themselves should have made.

---

[7]    With respect to the prohibition on punitive damages, at oral argument, the court asked HMSA's counsel why its physician agreement arbitration provisions continued to include this prohibition after this court had invalidated such provisions in Narayan, 140 Hawai'i at 554, 400 P.3d at 353. Counsel responded that the Narayan court invalidated an arbitration provision based not solely on the punitive damages prohibition but on other substantively unconscionable provisions, naming, for example, a limitation on discovery.  Oral argument, available at https://www.youtube.com/live/hzUSCTiQ3VA at 18:12 - 19:59. https://perma.cc/ER6N-3MD5 at 18:12 - 19:59.

While this court did conclude that the arbitration provision was unenforceable because it was procedurally unconscionable, and that other provisions were also substantively unconscionable, there was a clear holding that a limitation on punitive damages improperly "insulate[d] 'aggravated or outrageous misconduct' from the monetary remedies that are designed to deter such conduct." 140 Hawai'i at 554, 400 P.3d at 353.  We held that, "[u]nder Hawai'i law, such provisions, regardless of whether they are found in arbitration agreements or other contracts, are substantively unconscionable." Id.

**C. Analysis**

    **1. Arbitrability**

As a matter of law, when presented with a motion to compel arbitration, the court is limited to answering two questions: (1) whether an arbitration agreement exists between the parties; and (2) if so, whether the subject matter of the dispute is arbitrable under such agreement. Koolau Radiology, 73 Haw. at 445, 834 P.2d at 1300. The circuit court did not comply.

    **a. Whether an arbitration agreement exists between the parties**

The first step requires that the arbitration agreement exist and that it be in writing. Gabriel v. Island Pac. Acad., Inc., 140 Hawaiʻi 325, 334, 400 P.3d 526, 535 (2017) (citation omitted).

    **i. Participating Physician Agreement, Medicare Agreement, and QUEST agreement**

The existence of written agreements to arbitrate in the Participating Physician Agreement, Medicare Agreement, and QUEST Agreement is not disputed on appeal.

    **ii. Norton's member handbook and the Small Business CompMED (which applied to Dr. Nitta as a patient)**

The member handbooks for Norton and for Dr. Nitta, in his capacity as a patient, each contain a chapter titled "Dispute Resolution." That chapter requires members who "wish to dispute a decision made by HMSA related to coverage, reimbursement, this

Agreement, or any other decision or action by HMSA" to first request an appeal within a year of HMSA's action.  HMSA states it will issue a written decision within 30 or 60 days from the receipt of the appeal.

If a member disagrees with HMSA's decision with respect to "an issue of medical necessity, appropriateness, health care setting, level of care, or effectiveness; or a determination by HMSA that the service or treatment is experimental or investigational," the member "must" request review by an Independent Review Organization selected by the Insurance Commissioner.  "For all other issues," the member may "[r]equest arbitration before a mutually selected arbitrator" or "[f]ile a lawsuit against HMSA under 29 U.S.C. 1132(a) unless [the member's] plan is" a "church plan" under 29 U.S.C. 2002(33) or a "government plan" under 29 U.S.C. 1002 (32), in which case the member "must select arbitration." (emphases added).

Thus, this dispute resolution clause does not mandate arbitration unless the plan is a "church plan" or a "government plan."  There is nothing to indicate that Dr. Nitta's Small Business CompMED plan is a church plan or government plan.  Therefore, the claims brought by Dr. Nitta as a patient are not required to be arbitrated.

With respect to Norton, it appears the EUTF plan may be a government plan.  But even if it was, the next step in the

34

arbitrability analysis concerns whether Norton's claims fall within the scope of the handbook. For reasons set forth in Section IV.C.1.b.ii below, we hold they do not.

### iii. Orcino member's handbook

There is no arbitration provision in Orcino's member handbook. Orcino's handbook contains a section titled "Grievances and Appeals." Although somewhat confusing, the handbook indicates that members may submit grievances, appeals, and expedited appeals first to HMSA and then to DHS's Med-QUEST Division, or request state administrative hearings and expedited state administrative hearings. Orcino's claim, which is not arbitrable, is further discussed in Section IV.C.3 below.

### b. Whether the subject matter of the dispute is arbitrable

### i. In general

Even if an arbitration agreement exists, the second step in the arbitrability analysis requires a determination of whether the dispute is actually arbitrable -- in other words, whether the claims asserted fall under the scope of the arbitration agreement. As we have said, "the mere existence of an arbitration agreement does not mean that the parties must submit to an arbitrator disputes which are outside the scope of the arbitration agreement." UNIDEV, 129 Hawai'i at 394-95, 301 P.3d at 604-05. "What issues, if any, are beyond the scope of a

35

contractual agreement to arbitrate depends on the wording of the contractual agreement to arbitrate." Id.

In this section, we first analyze Norton's claims, then turn to the claims raised under the Participating Physician Agreement, Medicare Agreement, and QUEST Agreement.

### ii. Norton's member handbook

Norton's member handbook speaks of disputes related to "coverage, reimbursement, this Agreement, or any other decision or action by HMSA." The specific claims in the complaint that related to Norton were Count IV (tortious interference with a contractual right), Count VIII (NIED), and Count IX (IIED). Norton alleged that HMSA's delay in approving an MRI interfered with the doctor-patient relationship and delayed his ultimate cancer diagnosis. As a result, the cancer spread, Norton had to undergo emergency surgery, and was wheelchair-bound. During the course of the litigation, Norton died.

The ICA has held that an HMSA arbitration provision does not cover the kinds of claims made by Norton. Yogi v. Haw. Med. Serv. Ass'n, 124 Hawai'i 172, 238 P.3d 699 (App. 2010), is a case strikingly factually similar to Norton's. In that case, plaintiff Bert Yogi sustained injuries to his shoulder, neck, and back, which required multiple surgeries in the five years that followed. 124 Hawai'i at 173, 238 P.3d at 700. Yogi's doctor submitted a preauthorization request to HMSA for an

36

intrathecal infusion pump to treat Yogi.  Id.  HMSA denied the request.  124 Hawai'i at 173-74, 238 P.3d at 700-01.

Yogi's member handbook, like Norton's member handbook, required him to "request an appeal" from HMSA if he "wish[ed] to dispute a determination made by HMSA related to coverage, reimbursement, any other decision or action by HMSA, or any other matter related to this Agreement."  124 Hawai'i at 175, 238 P.3d at 702.  Similar to Norton's handbook, Yogi's handbook stated that HMSA will respond to the appeal within 60 calendar days.  Id.  Also similar to Norton's handbook, Yogi's handbook stated that, if the member disagreed with HMSA's appeal decision, the member could either request arbitration or request a review by a panel appointed by the Hawaii State Insurance Commissioner.  124 Hawai'i at 176, 238 P.3d at 703.

Yogi followed the internal appeal and external review procedures, which ultimately resulted in a reversal of HMSA's denial.  124 Hawai'i at 174, 238 P.3d at 701.  Yogi then filed suit against HMSA alleging that HMSA "acted unreasonably, wantonly, and oppressively in denying the preauthorization request for the intrathecal infusion pump," asserting claims for "breach of contract, bad faith, IIED and NIED," and seeking damages.  Id.  HMSA filed a motion to compel arbitration, which the circuit court denied.  Id.  HMSA appealed to the ICA, which affirmed the circuit court.  124 Hawai'i at 173, 238 P.3d at 700.

37

The ICA characterized the HMSA appeal provisions as covering situations in which an insured is "seek[ing] to have HMSA change its decision about [coverage]," because the intrathecal infusion pump was ultimately covered and implanted into Yogi. 124 Hawai'i at 174, 238 P.3d at 701. Instead, Yogi's lawsuit sought "damages for HMSA's alleged conduct over the approximate year and a half period from when [his doctor] sought preauthorization for the intrathecal infusion pump to when Mr. Yogi was able to undergo the procedure." Id. The ICA noted that HMSA's "appeal process is not intended to deal with claims such as bad faith, IIED or NIED, which seek money damages." 124 Hawai'i at 178, 238 P.3d at 705.

Similarly, in Norton's case, Norton no longer seeks to have HMSA change its mind about the MRI. HMSA ultimately did cover the MRI. Related to Norton's claims, plaintiffs seek money damages for the time period during which HMSA denied and delayed the approval of the MRI, which allegedly worsened his condition. Thus, even if Norton was subject to an arbitration provision via his member handbook, the claims he raised are not covered by that provision.

HMSA cites to UNIDEV, 129 Hawai'i 378, 301 P.3d 588, a more recent case from this court, for the proposition that the "arising under" language in arbitration provisions should be broadly interpreted in favor of arbitrating claims. In that

38

case, UNIDEV, a developer, entered into a contract with the County of Hawai'i to develop an affordable housing project. 129 Hawai'i at 380-81, 301 P.3d at 589-90.

The arbitration provision within the contract required the parties to jointly handle, then mediate, then arbitrate "[a]ny dispute arising under the terms of this Agreement." 129 Hawai'i 381, 301 P.3d 591. UNIDEV was terminated from the project, and the County then sued it for false claims, intentional misrepresentation, fraudulent inducement, negligent misrepresentation, negligence, and unfair and deceptive practices. 129 Hawai'i at 381-82, 301 P.3d at 591-92. UNIDEV filed counterclaims against the County, its transferee, and its lessee for breach of contract, quantum meruit, intentional interference with contract, and fraudulent transfer. Id. UNIDEV then filed a motion to compel arbitration, which the circuit court granted. 129 Hawai'i at 382, 301 P.3d at 591.

This court held that the arbitration clause in question, containing the "arising under" language, was a "general" arbitration clause that contained "no limiting language" and thus covered all of the claims and counterclaims between the parties. 129 Hawai'i at 395-96, 301 P.3d at 605-06.

UNIDEV, however, is distinguishable. The claims and counterclaims did arise under the contract. UNIDEV did not mention or overrule Yogi, which is factually similar to Norton's

case.  Norton's arbitration clause, like Yogi's, covers situations in which an insured is seeking to have HMSA change its decision about coverage.  Likewise, Norton's claims do not fall under the scope of the arbitration agreement.

### iii. Provider agreements

We turn now to the provider agreements (the Participating Physician Agreement, the Medicare Agreement, and the QUEST Agreement) to determine whether the plaintiffs' claims fall within the scope of the arbitration provisions in those agreements.

### (a)  Participating Physician Agreement

First, with respect to the Participating Physician Agreement, we note that it (but none of the other agreements) contains a "delegation provision" expressly providing the initial determination of arbitrability itself is subject to arbitration:  "The arbitrator shall also hear and determine any challenges to the arbitration agreement and any disputes regarding whether a controversy is subject to an agreement to arbitrate."

In other words, in the Participating Physician Agreement, the issue of arbitrability in the first instance has been delegated to the arbitrator.

With respect to such provisions, the United States Supreme Court in Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63

40

(2010), explained that a "delegation provision" in an arbitration provision is "an agreement to arbitrate threshold issues concerning the arbitration provision." 561 U.S. at 68. In Rent-A-Center, a former employee filed a federal employment discrimination suit against his former employer, Rent-A-Center. 561 U.S. at 65. Both employer and employee had entered into a "Mutual Agreement to Arbitrate Claims," including claims for discrimination and claims for violation of any federal law. 561 U.S. at 65-66. The arbitration provision also contained a delegation provision, which stated that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." 561 U.S. at 66.

The employer moved to compel arbitration, and the employee opposed, arguing the arbitration agreement was unenforceable because it was unconscionable. Id. The district court granted the motion to compel arbitration. Id. The Ninth Circuit Court of Appeals affirmed in part and reversed in part, acknowledging the delegation provision, but holding that "the threshold question of unconscionability is for the court." 561 U.S. at 67.

The United States Supreme Court reversed the Ninth Circuit and held that, because the party seeking to avoid arbitration did not "challenge[] the delegation provision specifically, [the Court] must treat [the delegation provision] as valid" and enforceable, "leaving any challenge to the validity of the Agreement as a whole for the arbitrator."  561 U.S. at 72.

Like in Rent-A-Center, the delegation provision in the Participating Provider Agreement's arbitration clause provides that the question of whether a claim is arbitrable is to be determined by the arbitrator in the first instance.  Like in Rent-A-Center, the plaintiffs here, as the parties seeking to avoid arbitration, did not challenge the delegation provision. Pursuant to Rent-A-Center, the delegation provision must therefore be treated as valid and enforceable.

For this reason, the circuit court's order is vacated to the extent it denied arbitration for claims arising under the Participating Provider Agreement.  The issue of arbitrability is reserved to the arbitrator to determine.

### (b) Medicare Agreement and QUEST Agreement

Turning now to the Medicare Agreement and QUEST Agreement, their arbitration provisions require the parties to arbitrate "any and all claims, disputes, or causes of action arising out of this Agreement or its performance,"  including but not

42

limited to "any and all claims, disputes, or causes of action based upon contract, tort, statutory law, or actions in equity."

In contrast with the Participating Provider Agreement, these provider agreements do not contain delegation provisions.

We look to the complaint to determine whether plaintiffs' claims fall within the scope of the arbitration provisions in those agreements.

Count I (tortious interference with a contractual right) alleged that HMSA denied tests and courses of treatment for thirty of FNI's patients, which meant FNI was not paid for work done for these patients.

Count II (tortious interference with a contractual right) alleged that HMSA unilaterally switched six of FNI's patients over to other primary care physicians without notice.

Count V (unfair method of competition) alleged that HMSA engaged in unfair methods of competition by delaying or denying claims for payment and unilaterally switching patients over to other primary care physicians.

Count VI (RICO) alleged that HMSA engaged in theft of services and failure to make required disposition of funds.

Count VII (declaratory relief) sought a declaration that FNI's "Patient Information" and "Payment Policy" documents were legally enforceable contracts between physician and patient and

43

that HMSA shall not interfere with that contractual relationship.

As HMSA argues, these counts challenge HMSA's actions under the Medicare Agreement and QUEST Agreement, specifically HMSA's coverage, payment, and termination decisions. Therefore, these claims arise under the arbitration provisions of the Medicare Agreement and QUEST Agreements.

## 2. Unconscionability as a defense to arbitration

Even if claims are initially deemed arbitrable, plaintiffs can avoid arbitration by "[c]halleng[ing] the validity of arbitration agreements 'upon such grounds as exist at law or in equity for the revocation of any contract. . . .'" Buckeye, 546 U.S. at 444 (emphasis added). Arbitration agreements, like all other contracts, may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability." Narayan, 140 Hawai'i at 350, 400 P.3d at 551.

To repeat, however, the challenge can only be as to the alleged unconscionability of the arbitration clause itself, because "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." Buckeye, 546 U.S. at 445-46.

44

This court has explained that unconscionability consists of procedural unconscionability and substantive unconscionability. See Narayan, 140 Hawai'i at 350, 400 P.3d at 551.

Procedural unconscionability, or unfair surprise, focuses on the process by which the allegedly offensive terms found their way into the agreement. Narayan, 140 Hawai'i at 351, 400 P.3d at 552. Procedural unconscionability often takes the form of adhesion contracts, where a form contract is created by the stronger of the contracting parties, and the terms unexpectedly or unconscionably limit the obligations and liability of the weaker party. Id. Although adhesion contracts are not unconscionable per se, they often satisfy the procedural element of unconscionability. Id.

Substantive unconscionability, by contrast, focuses on the content of the agreement and whether the terms are one-sided, oppressive, or unjustly disproportionate. Id.

Generally, a determination of unconscionability requires a showing that the contract was both procedurally and substantively unconscionable when made, but there may be exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone. Balogh v. Balogh, 134 Hawai'i 29, 41, 332 P.3d 631, 643 (2014). In other words, a contract may be so substantively unconscionable as to obviate

the need to show that it is also procedurally unconscionable. This also means that substantive unconscionability must always be found to exist to declare an arbitration provision unconscionable and therefore unenforceable. Id.

But to avoid arbitration, unconscionability must be raised as to the arbitration provision itself, not to the contract as a whole. See Buckeye, 546 U.S. at 445-46 ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance."). Hawai‘i appellate opinions have similarly held. See, e.g., Lee v. Heftel, 81 Hawai‘i 1, 4, 911 P.2d 721, 724 (1996) ("Thus, because the [party seeking to avoid arbitration's] general allegations were based on fraud in the inducement of the contract as a whole, rather than fraud in the inducement of the arbitration clause, we hold that the claim should be decided first by mediation, and then, if necessary, by arbitration, in accordance with the terms of the DROA contract.").

Throughout these proceedings, plaintiffs focused their unconscionability analysis on the HMSA agreements as a whole. They argued they were unable to negotiate contract terms with HMSA and that, therefore, the contracts were adhesive and procedurally unconscionable in their totalities. As to substantive unconscionability, Plaintiffs argued that the

contracts as a whole violated public policy because they interfered with the statutory definition of the practice of medicine. Plaintiffs made only passing comments as to how any of the specific terms within the arbitration provisions were substantively unconscionable: first, that the Medicare Agreement allows HMSA to "dictate[] the location where any arbitration will be held"; and second, that the QUEST Agreement allows HMSA to "reserve[] the right to dictate the terms, process and location of arbitration."

These allegations of substantive unconscionability of the arbitration provisions within the Medicare and QUEST Agreements are, however, inaccurate. HMSA correctly notes that although the Medicare Agreement states that arbitration will be held in Honolulu, it also states that neighbor island physicians may participate by phone. HMSA is also correct in noting that the QUEST Agreement states that the arbitration shall be conducted in accord with the Commercial Arbitration Rules of the American Arbitration Association, that the parties will appoint the arbitrator, and does not mention a location for arbitration.

In this case, plaintiffs have not established that the arbitration provisions are substantively unconscionable. As substantive unconscionability must always be established for unconscionability to be found, we therefore need not and do not

address the issue of whether the arbitration provisions are procedurally unconscionable.

Hence, the circuit court erred by concluding that the Medicare and QUEST arbitration provisions are unconscionable and unenforceable. We hold that as to claims arising under the Medicare Agreement and QUEST Agreement, the circuit court erred in denying HMSA's motion to compel.

### 3. Orcino's claim

Lastly, we address Orcino's claim. In the complaint, Orcino alleged that HMSA's refusal to cover her prescription for Nifedipine interfered with the doctor-patient relationship, worsened her condition, and resulted in the premature birth of her child, who is now severely disabled, for which she seeks damages.

As part of its motion, HMSA moved to dismiss Orcino's claims, alleging that she did not exhaust the DHS administrative appeals procedure set forth in her Quest Integration Member Handbook. But the member handbook does not appear to contain any mandatory grievance and appeal remedies. Rather, it continuously uses "may" language with respect to grievances and appeals.[8]

---

[8] See supra note 3.

We need not decide, however, whether the grievance and appeal procedure is mandatory or discretionary.  This is because it no longer applies to Orcino's claims in the complaint.  Orcino is no longer seeking coverage under the policy.  She is seeking damages for HMSA's refusal to honor Dr. Nitta's Nifedipine prescription to prevent premature labor, which has allegedly caused developmental challenges to her child resulting from his premature birth.  Like in the Yogi appeal provisions, the grievance and appeal provisions cover situations in which an insured is seeking to have HMSA change its decision about coverage.  That is not the subject of Orcino's claims.

Thus, similar to Norton's claims that are not subject to arbitration, the grievance and appeals procedure in Orcino's handbook are no longer applicable.  The circuit court therefore appropriately denied HMSA's motion to dismiss Orcino's claims for lack of subject matter jurisdiction.  Therefore, on remand, Orcino's claims can be bifurcated and proceed to litigation.

### V. Conclusion

Based on the reasons above, the circuit court's order is vacated in part and affirmed in part.

Specifically (1) plaintiffs' claims arising under the Participating Physician Agreement are subject to arbitration because the delegation provision was unchallenged and it is up to the arbitrator to determine arbitrability; (2) plaintiffs'

49

claims arising under the Medicare Agreement and QUEST Agreement are subject to arbitration because the claims are arbitrable and the defense of unconscionability of the arbitraton clause fails due to a lack of showing of substantive unconscionability; (3) Norton's claims are not subject to arbitration because whether or not an arbitration agreement exists, the subject matter of his claims is not arbitrable; (4) Dr. Nitta's claims as a patient under his Small Business CompMED plan are not subject to arbitration because there is no mandatory arbitration clause; and (5) Orcino's claims arising under Orcino's member handbook are not subject to arbitration.  Therefore, the claims asserted by Norton, Dr. Nitta as a patient, and Orcino may be bifurcated and proceed to litigation on remand.

We therefore order that this case be remanded to the circuit court for further proceedings consistent with this opinion.

| | |
|---|---|
| Ted H.S. Hong<br>for plaintiffs-appellees | /s/ Mark E. Recktenwald |
| | /s/ Sabrina S. McKenna |
| Randall C. Whattoff<br>for defendant-appellant | /s/ Todd W. Eddins |
| | |
| Tred R. Eyerly<br>for amici curiae | /s/ Lisa M. Ginoza |
| Hilo Community Surgery<br>Center; Kauai Community<br>Health Alliance; Stuart<br>Lerner, M.D.; Michelle<br>Mitchell, M.D.; and<br>Casey Yamashita, M.D. | /s/ Vladimir P. Devens |



Clarence S.K. Kekina
for amici curiae
Hawaii Medical Association and
the American Medical Association

Cynthia K. Wong
for amicus curiae
Maui Nui Medical Society